**FILED**

**05/03/2022**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

CODY KUHN
        Plaintiff,

V.

JERRY SNYDER, et al.,
        Defendants.

Case No. _____

CIVIL RIGHTS COMPLAINT
[§ 1983]

COMES NOW,                    Plaintiff, pro se,
who presents the following civil rights complaint and
claims for monetary damages in the form of punitive
and compensatory relief, for violations of his Eighth
Amendment and Fourteenth Amendment rights of the
United States Constitution as follows:

## I. PARTIES

Plaintiff;

1. CODY KUHN, former prisoner, served a
criminal sentence in the Indiana Department of
Corrections.

1.

At all times relevant to this action, plaintiff was in the custody, care, and control of the defendants; while held in SCU/SHU, the solitary confinement unit at Wabash Valley Correctional Facility (WVCF), P.O. Box 1111, Carlisle, IN. 47838.

Defendants;

Name: JERRY SNYDER
Title: Unit Team Manager
Address: WVCF, P.O. Box 1111
        Carlisle, IN. 47838

2. Defendant JERRY SNYDER at all times relevant to this action was employed as Unit Team Manager of SCU at WVCF. UTM Snyder is directly in charge of daily operations within SCU. At all times relevant to this complaint, defendant Snyder acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: CHARLES DUGAN
Title: Caseworker
Address: WVCF, P.O. Box 1111
        Carlisle, IN. 47838

3. Defendant CHARLES DUGAN at all times relevant to this action was employed as a caseworker (CW4), in SCU at WVCF. Defendant Dugan's duties include, but are not limited to, preparing reviews for inmates housed within SCU, once every thirty-days, as well as periodically and annually. The purpose of said reviews is to evaluate an inmates recent conduct to

2.

determine whether continued segregation is warranted. At all times relevant to this complaint, defendant Dugan acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: ASHLYNN GONTHIER
Title: Caseworker/CW4
Address: WVCF, P.O. Box 1111
             Carlisle, IN. 47838

    4. Defendant ASHLYNN GONTHIER at all times relevant to this action was employed as a caseworker at WVCF. Defendant Gonthier's duties include, but are not limited to, preparing thirty-day reviews, as well as annual reviews for inmates housed within SCU. The purpose of said reviews is to evaluate an inmate's recent conduct to determine whether continued segregation is warranted. At all times relevant to this complaint, defendant Gonthier acted under the color of state law. She is hereby sued in her individual as well as official capacity, jointly and severally for those acts and omissions described fully below.
    *Note: At all times relevant to this complaint, Ashlynn Gonthier was known as Ashlynn Ledford.

Name: RICHARD BROWN
Title: Superintendent/Warden
Address: WVCF, P.O. Box 1111
             Carlisle, IN. 47838

    5. Defendant RICHARD BROWN at all times

3.

relevant to this action was employed as Warden at WVCF, charged with the custody and care of the plaintiff. Warden Brown is the facility's highest authority responsible for the appointment, employment, and oversight of facility staff, and oversight of facility operations generally, and is the final appellate authority over inmate institutional grievances and concerns. At all times relevant to this complaint, Warden Brown acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: FRANK LITTLEJOHN
Title: Assistant Warden/Operations
Address: WVCF, P.O. Box 1111
        Carlisle, IN. 47838

6. Defendant FRANK LITTLEJOHN at all times relevant to this action was employed as Assistant Warden over operations at WVCF, and charged with the custody and care of the plaintiff. Asst. Warden Littlejohn is the facility's second highest authority. At all times relevant to this complaint, defendant Littlejohn acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: KEVIN GILMORE
Title: Assistant Warden/Re-entry
Address: WVCF, P.O. Box 1111
            Carlisle, IN. 47838

7. Defendant KEVIN GILMORE at all times relevant to this action was employed as Assistant Warden over Re-entry at WVCF, charged with the custody and care of the plaintiff. Defendant Gilmore's duties include, but are not limited to, ensuring that each inmate is provided with meaningful re-entry programs prior to being released from IDOC custody. At all times relevant to this complaint, defendant Gilmore acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: MATT LEOHR
Title: Supervisor of Classification
Address: WVCF, P.O. Box 1111
            Carlisle, IN. 47838

8. Defendant MATT LEOHR at all times relevant to this action was employed as Classification Supervisor at WVCF. Defendant Leohr is tasked with the duty of ensuring that all WVCF inmates are properly classified and housed within the facility. At all times relevant to this complaint, defendant Leohr acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

Name: JACK HENDRIX
Title: Executive Director of Classification
Address: 302 W. Washington Street
          Indianapolis, IN. 46204-2738

9. Defendant JACK HENDRIX at all times relevant to this action was employed as Executive Director of Classification over the Indiana Department of Corrections. Defendant Hendrix is tasked with the duty of ensuring that all Indiana inmates are properly classified and housed, and to ensure that no inmate is arbitrarily housed in solitary confinement for a period longer than is necessary. At all times relevant to this Complaint, defendant Hendrix acted under the color of state law. He is hereby sued in his individual as well as official capacity, jointly and severally for those acts and omissions described fully below.

## II. JURISDICTION AND VENUE

10. Jurisdiction is asserted pursuant to the United States Constitution and 42 U.S.C. § 1983, to redress the deprivations of those rights secured by the United States Constitution, deprived by persons acting under color of state law. The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 1331, 1343 (a)(3).

11. The United States District Court, Southern District of Indiana, Terre Haute Division is the appropriate venue for trial pursuant to 28 U.S.C. § 1391 (b)(2).

6.

## III. PREVIOUS LAWSUITS

12. Plaintiff has no pending or prior civil suits. This is the first and only civil suit regarding the issues described in this complaint.

## IV. CAUSE OF ACTION

13. GROUND 1, PERIODIC REVIEWS : Defendants were deliberately indifferent to plaintiff's Fourteenth Amendment right to due process, resulting in plaintiff being held in solitary confinement, under horrendous conditions, for two-years. Each defendant was bound by duty to provide or, ensure that plaintiff was provided, sufficient due process in the form of meaningful periodic reviews. Meaningful periodic reviews are necessary to ensure that prisoners are not arbitrarily held in solitary confinement. Plaintiff spent four and one-half years in disciplinary segregation, with the last two-years spent in solitary confinement in the SHU/SCU, at WVCF. During that time, defendants provided plaintiff with no meaningful review process, instead, depending on perfunctory, identical 30-day reviews, which were previously determined to be meaningless, pre-determined, sham reviews which do not pass constitutional muster. Plaintiff wrote very detailed requests and letters to defendants Brown and Snyder requesting a meaningful review of his status due to plaintiff being clear of conduct for over three years. Defendants Brown, Gilmore, and Snyder responded, stating that plaintiff is not entitled to a meaningful review, simply because he was in disciplinary segregation, rather than administrative segregation.

14. GROUND 2, CRUEL AND UNUSUAL PUNISHMENT: Defendants Brown, Littlejohn, Gilmore, Snyder, Dugan, Gonthier, and Leohr, were deliberately indifferent to plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff spent two-years in solitary confinement, under extremely harsh and atypical conditions. Plaintiff was held in a 7×12, windowless cell, which can only be described as a tomb, 23-hours a day. Plaintiff had no control over the lighting in his cell, which remained on 24-hours a day, causing severe sensory deprivation, sleep deprivation, and constant disorientation. Unlike inmates in population, every time plaintiff left his cell, he was first strip-searched, then, placed in restraints, behind his back, with a leash, and leg shackles. All meals were eaten alone, in the cell, with the plastic food tray being passed through a narrow slot in an otherwise solid steel door. The meals were sparse and lacking in proper nutrition, resulting in weight loss of approximately 20-pounds. Unlike inmates in population, plaintiff had no access to vocational, work, or educational programs. Plaintiff had no access to religious services or the facility's law library. Plaintiff's only outdoor recreation was limited to a dog kennel like cage, not much bigger than his cell. The recreation cage contains no exercise equipment. Said cages also contained excessive amount of human waste, standing water, bird feces and dead birds, leaving little opportunity for meaningful outdoor exercise. Plaintiff was allowed only three showers a week, while inmates in population shower daily. Phone calls were limited to one, twenty-minute phone call per week, as opposed to nearly unlimited telephone access enjoyed in population. Plaintiff was not allowed any meaningful visitation with his family. All visits on the SHU/SCU were restricted and eventually eliminated completely.

8.

GROUND 2, Cont.: Plaintiff has suffered great mental and emotional injuries due to his prolonged stay in solitary confinement. Plaintiff also suffered several intangible injuries, such as; deprivation of society, deprivation of meaningful human contact and ease of communication, the loss of freedom of movement, and diminished quality of life.

As prison officials and long-time employees of WVCF, each defendant knew, or should have known, that long-term isolation in solitary confinement (SHU/SCU), causes mental and emotional damage which lasts long after one's release from solitary confinement. Each defendant was responsible for either recommending or approving plaintiff's stay in isolation, or for denying his release.

15. GROUND 3, LACK OF VISITATION: Defendants Brown, Littlejohn, Gilmore, were deliberately indifferent to plaintiff's need for meaningful visitation, communication, and human contact. Visiting procedures in SHU/SCU are overbroad and overly restrictive, beyond any reasonable penological interest to protect the safety and security of the facility against trafficking. From it's construction, the SHU has been equipped with non-contact visitation booths, installed for the sole purpose of inmate/family visitation. Non-contact visitation booths are broom-closet sized rooms with a thick pane of glass between the inmate and the visitor. The partition reaches from the floor to the ceiling, eliminating any risk of trafficking, or any actual physical contact. However, inmates in SHU are not permitted to use the non-contact visitation booths, rather, the inmate's family member is forced to travel to the facility, endure a search, physical pat-down, only to be escorted to a seperate part of the SHU to visit the inmate via two-way feed monitor. All visits are monitored and recorded, leaving no reasonable

9.

- expectation of privacy or intamacy. In December, 2019, Covid-19 swept across the nation, soon after, WVCF barred all non-employees from entering any part of the facility, thereby eliminating all visitation for inmates housed in the SHU. For several years, the IDOC, including WVCF, has had the capability of allowing visitors to visit inmates via video visit, eliminating the need to travel to the prison. After the onset of Covid-19, every housing unit at WVCF, not including SHU/SCU, was provided daily/weekly video visitation opportunities. To allow visitation for every inmate, other than SHU inmates, shows clear discrimination toward inmates housed in SHU, including plaintiff, violating plaintiff's rights to equal protection and equal treatment.

16.   GROUND 4, LACK OF MEANINGFUL RE-ENTRY:
   Plaintiff was placed in disciplinary segregation in December, 2015, where he remained until his release from prison. Plaintiff spent the last two-years of his incarceration housed in solitary confinement. At the time of his release, plaintiff had approximately three-years clear of any Class A, and Class B conduct reports. Considering plaintiff's extended period of clear conduct, the fact that plaintiff was incarcerated at the age of seventeen, and his five-year stay in segregation, made plaintiff a prime example as to why meaningful re-entry is so necessary. As plaintiff's Caseworkers, defendants Dugan and Gonthier (Ledford) were directly responsible for ensuring that plaintiff received meaningful re-entry. As Assistant Warden over Re-enty, defendant Gilmore was personally responsible for ensuring that meaningful re-entry services were

provided to plaintiff prior to his release from prison.

## V. STATEMENT OF FACTS

17.   Plaintiff was incarcerated on March 3, 2012, at the age of seventeen.

18.   In February, 2013, plaintiff arrived at Pendleton Correctional Facility.

19.   In December, 2015, plaintiff was placed in disciplinary segregation.

20.   Plaintiff received segregation time beyond his actual prison release date.

21.   In June, 2018, plaintiff was transferred from the disciplinary unit at Pendleton to the SHU at WVCF, where he would remain until his release from prison on May 4, 2020.

22.   Plaintiff arrived on the SHU with a body weight of 155 pounds, and weighed only 130 pounds at the time of his release, two-years later.

23.   During plaintiff's time in solitary confinement, he was not allowed to purchase commissary food items, despite WVCF Policy And Administrative

procedure 02-04-102, which, at the time, clearly stated "Offenders held on disciplinary restrictive status housing for periods exceeding 60 days are provided the same program services and privileges as inmates in administrative restrictive status housing and protective custody. Programs and services shall include, but are not limited to: educational services, commissary services, library services, social services, counseling services, religious services, and recreational programs."

24.    Plaintiff, being disciplinary status, never enjoyed any of the programs and services allowed by administrative status inmates.

25.    Plaintiff was not allowed to supplement his diet with any alternate food source, being restricted to only the sparse trays consisting of mostly soy products, causing malnutrition, resulting in dizzy spells, weight loss, and constant gastric pain and digestive trouble.

26.    Immediately upon arrival to the SHU, the majority of plaintiff's personal property was confiscated, including his personal clothing, hot pot, fan, hygiene items, bowls, and drinking cup.

27.    Plaintiff was not allowed to order actual hygiene products, but rather trial sized, state issue products which are provided to inmates at no cost in a monthly indigent kit. However, because plaintiff had at least $15.00 on his account, he was forced to pay for these items.

28.    Plaintiff was not allowed to purchase or possess an actual toothbrush the entire two-years housed in SHU.

29.    Prisoners housed in SHU are to only be confined within their cells 23 hours per day. However, outdoor recreation was often cancelled for various reasons, forcing plaintiff to remain locked in his cell for periods of 24, 48, and sometimes 72 hours. This usually occurred over the weekend, Friday, Saturday, and Sunday.

30.    Physical conditions within the SHU were extremely harsh and atypical, resulting in not only physical pain, but great emotional and mental injuries, as well.

31.    Plaintiff was completely isolated in a cell, for 23 hours or more, for two-years.

32.    Plaintiff's cell consisted only of four, non-insulated concrete walls, a stainless steel sink and toilet, a metal desk, and a concrete slab for a bed.

33.    Temperatures in the SHU often remained well below normal temperatures for various reasons such as no insulation, and heating units falling in to complete disrepair for long periods of time.

34.    Because plaintiff had most of his personal property confiscated upon arrival to the SHU, such as personal sweat clothes, he was unable to protect himself from the cold temperatures, causing physical pain.

35.     Prisoners housed in SHU are allowed only the following, state-issued clothing and bedding items: 1-thin, knitted blanket, 1-sheet, 2-towels, 2-wash cloths, 2-thin, oversized jumpsuits, 3-boxers, 3-t-shirts, 3-socks, 1-pair of canvas slip-on shoes, 1-coat. * Plaintiff's coat was very old and thin, missing much of the inner-lining due to the previous owner fashioning inside "pockets."

36.     With only one blanket and the concrete bed being positioned at the rear of the cell, between two outside walls, plaintiff felt extremely cold while trying to sleep during the winter months, often shivering all night.

37.     Laundry in SHU is turned in one night, and not returned until the following evening, leaving plaintiff with no blanket and very little clothing, twice a week, for periods of 24-hours or more.

38.     Plaintiff was often forced to wake up in the middle of the night to walk or exercise to bring his body temperature up.

39.     Shower temperatures in SHU often fluctuated; being near-scalding in the summer, to ice cold during the winter. Plaintiff was often forced to shower in freezing water, only to return to his freezing cell.

40.     Showers in SHU are a small, concrete box, with a solid, steel door, and no ventilation.

41.     Due to the small vent in the shower always being completely clogged with dust and debris, the showers feel extremely suffocating.

42.     Due to the lack of ventilation and lack of regular cleaning, the showers often had formations

14.

of black mold on the inside of the door, as well as thick, black sludge inside the inner-door track, and around the shower drain.

43.     Plaintiff was often forced to remain locked in the shower for long periods of time, forced to inhale the thick odor of mold and mildew.

44.     The air quality in plaintiff's cell was also very poor, due to the air ducts and ventilation holes being completely covered and clogged with dust and debris.

45.     The lack of ventilation, combined with the cold, damp conditions, caused spots of black mold to form on the rear wall of plaintiff's cell during the colder months.

46.     Because the rear wall is an exterior wall, moisture from the outdoors would seep through the non-insulated cinder block, allowing the mold to form.

47.     Because plaintiff's bed was part of the rear wall, he was forced to inhale the toxic mold spores while he slept.

48.     Long-term exposure to the mold caused plaintiff to suffer from frequent headaches, sore throat, and constant nasal irritation.

49.     The outdoor recreation area in SHU is a small, dog kennel like cage, positioned on a concrete slab, with no proper drainage.

50.     The construction of the cages, combined with the lack of drains, often caused rain water to accumulate, causing one-two inches of water to remain.

51. Depending on the weather, the standing water often remained in the cages for several days at a time.

52. The outdoor cages were also covered in bird feces, human feces, human urine, trash, discarded clothing, and even dead birds.

53. Many inmates in solitary confinement express their anger by throwing feces, urine, and semen on one-another. The best opportunity for this is during outdoor recreation.

54. Because the cages are seldom cleaned, the bird and human feces is often mixed with the standing rain water, creating a cesspool for inmates to stand in.

55. Such conditions are a bio-chemical health hazard.

56. Plaintiff was physically assaulted during outdoor recreation when another inmate threw feces on him.

57. The other inmate was known to have hepatitis; an easily transmittable disease.

58. This attack was witnessed by SHU staff, however, plaintiff was not allowed to leave the recreation area after the attack.

59. Plaintiff's only option was to strip down to his boxers for the remainder of his recreation period.

60. Plaintiff was denied a shower after the attack because it was not his designated shower day.

61.   Plaintiff was told that, because the feces only got on his clothing and not on his face and skin, he did not need a shower.

62.   While plaintiff did not contract hepatitis from the attack, the entire episode caused great psychological and emotional damage to plaintiff.

63.   Not being able to shower after the attack made plaintiff feel as if he were less than a human being.

64.   While no one forced plaintiff to go to outdoor recreation and endure such conditions, plaintiff's only other option was to remain isolated in his cell indefinitely.

65   When a person has only two options of either (a) risking the psychological injuries of prolonged self-isolation, or (b) risking the physical injuries of exposure to bio-hazardous conditions, that is no option at all.

66.   Plaintiff was subjected to overbroad and overly restrictive visitation policies which served no legitimate penological interest.

67.   From the time it was built, the SHU has had non-contact visitation booths which would allow family members to visit in person, while remaining seperated by a glass partition.

68.   The glass partition reaches from the floor to the ceiling, eliminating any risk of actual contact, as well as any risk of trafficking contraband in to the facility.

69.     The non-contact booths are sufficient to maintain and protect the safety and security of the facility.

70.     During the relevant time period, inmates housed in SHU were not permitted to use the non-contact visitation booths.

71.     Visitors were forced to drive to the facility, only to visit SHU prisoners on a two-way feed monitor, never actually seeing their loved one.

72.     Often, the video visit was in black and white, due to certain monitors being broken.

73.     For the prisoners housed in SHU, these visiting practices served no purpose other than psychological torture.

74.     The inmate's monitor is in a small, 4x4 foot box, located in the inmate's immediate living area, only a few feet from his cell.

75.     This accomplishes the purpose of keeping all SHU inmates trapped in their immediate living area, eliminating any hope of outside stimulation or actual socialization.

76.     In December, 2019, Covid-19 began to sweep across the nation.

77.     As a result of Covid-19, WVCF barred all non-employees from entering any part of the facility, including the SHU.

78.     This eliminated all visitation for inmates,

including plaintiff, housed in SHU.

79.   For several years, the IDOC, including WVCF, has had the capability of allowing non-prisoners to visit prisoners from home, via video visitation applications, eliminating the need to travel to the facility.

80.   After the onset of Covid-19, every housing unit at WVCF, not including SHU, was provided weekly video visitation opportunities.

81.   Because the defendants refused to provide these capabilities to SHU inmates, plaintiff was denied any and all visitation until his release from prison on May 4, 2020.

82.   Plaintiff's fast-approaching release date further increased his need for meaningful human contact, socialization, as well as the need to re-establish a bond with his mother, father, and siblings.

83.   The fact that plaintiff spent two-years in such an extremely atypical environment increased these needs exponentially.

84.   Prisoners have no constitutionally protected right to contact visits, however, prison officials may not completely eliminate all visitation without a legitimate penological interest.

85.   To provide visitation opportunities for every housing unit at WVCF, excluding the SHU, is clear discrimination toward inmates housed in SHU, including plaintiff, violating plaintiff's right to fair and equal treatment by similarly situated individuals.

86.    The defendants had ample time and opportunity to install GTL monitors in the SHU, which would have allowed family members to visit from home.

87.    These monitors were installed in every other housing unit at WVCF, allowing weekly visitation for every WVCF inmate not housed in SHU.

88.    When plaintiff inquired as to why SHU inmates were not being provided GTL video visits, he was told that he put himself on the SHU, and that he did not deserve video visits.

89.    The defendants did not actually install GTL monitors on the SHU until approximately October, 2021, more than a year after plaintiff's release, and nearly two full years after the onset of Covid-19.

90.    The defendants' refusal to provide GTL video visitation to SHU inmates resulted in those inmates having absolutely zero visitation for nearly two years.

91.    Plaintiff was released from SHU, in to society, with no meaningful re-entry.

92.    Re-entry is provided to all prisoners prior to release to ensure that each individual possesses the life-skills necessary to succeed after incarceration.

93.    Re-entry is mandatory for every incarcerated individual.

94.     Policy And Administrative Procedure #01-07-101, Effective date, January 1, 2020, Pre-release and Re-entry Programming: Section X, Pages X-1 - X-9 , (1) Substance Abuse Education; (2) Living Skills; (3) Family Dynamics; (4) Educational Advancement ; (5) Community Resources Identification; and, (6) Job Search Training / Workforce Readiness.

95.     Section X, part C, (S.T.A.R.T.) Successful Transition And Re-entry Training. START is a Pre-Release Course that consists of six (6) Core Workshops that adhere to Indiana Code 11-13-8-3. START further consists of Elective Workshops that are intended to meet additional needs that inmates may have.

96.     Plaintiff was in need of each of these tools.

97.     Plaintiff was in need of some form of meaningful, interactive re-entry program.

98.     Plaintiff requested several times to participate in some form of meaningful re-entry.

99.     The defendants simply provided plaintiff a paper packet, sent to plaintiff in his mailbag, for plaintiff to complete, alone, in his cell.

100.    The following facts should have been considered in determining plaintiff's re-entry needs:

101.    The fact that plaintiff was incarcerated at the age of seventeen.

102.    That plaintiff spent more than eight years incarcerated.

103. That plaintiff spent his last 4½ years of his sentence housed in complete segregation.

104. That plaintiff spent his last two-years of his sentence completely isolated in solitary confinement.

105. At the time of plaintiff's release, May 4, 2020, plaintiff had three-years clear of any A or B conduct reports, making plaintiff eligible for release to general population where meaningful re-entry would have been available.

106. Plaintiff was forced to face the world for the first time as an adult with no real life skills.

107. Defendant, Kevin Gilmore, as Assistant Warden over Re-entry, was directly responsible for providing plaintiff with meaningful re-entry services.

108. Defendants, Snyder, Dugan, and Gonthier (Ledford) were directly responsible for reviewing plaintiff's case plan to ensure his re-entry needs were being met.

109. The complete lack of meaningful periodic reviews resulted in plaintiff's prolonged isolation in solitary confinement and lack of meaningful re-entry services.

110. As a result of his prolonged isolation and lack of re-entry services, plaintiff had no transition between solitary confinement and his return to society.

111. Since his release, plaintiff has suffered great emotional and psychological pain.

22.

112.    Plaintiff suffers from extreme paranoia and trust issues, making it extremely difficult to form and maintain long term, meaningful relationships.

113.    Plaintiff has been unable to maintain long term gainful employment, having gone through eight different jobs in less than two-years.

114.    Plaintiff was arrested less than one-month after being released, due to a fight at his place of employment, due to his lack of problem solving and conflict resolution skills.

115.    Plaintiff was forced to spend fourteen-days in the County Jail and pay $600⁰⁰ bail.

116.    Plaintiff was again arrested a short time later, violating his probation.

117.    Plaintiff was held in segregation and solitary confinement for years, psychologically and emotionally tortured, and treated like an animal, then expected to adjust to society and act like a civilized human being the very next day.

118.    Defendants Brown, Littlejohn, Gilmore, Snyder, Dugan, and Gonthier (Ledford) are each responsible for failing to provide plaintiff with meaningful periodic reviews of his status in solitary confinement.

119.    Meaningful periodic reviews are necessary to ensure that prisoners are not held in solitary confinement indefinitely.

120.    Periodic reviews cannot be a sham review with a pre-ordained conclusion.

121.    A meaningful review must consider recent-past conduct, current conduct, and future prospects.

122.    A meaningful review is one that is specific to that particular prisoner, assessing his needs, progress, and treatment plans, not using the exact same pretextual, boilerplate language, month after month.

123.    The defendants were made aware in 2018, that the 30-day review process in use at the time was meaningless and did not meet Constitutional requirements.

124.    The defendants continued to provide plaintiff with the same reviews, consisting of only three-lines, for approximately 24-months.

125.    The reviews were sent to plaintiff in his mailbag each month, with no actual review ever taking place.

126.    The review sheets contained no vital information and no instructions as to how the review may be appealed.

127.    The review sheets contained no actual date and no staff signature.

128.    Plaintiff filed several grievances regarding the 30-day review sheets and lack of due process. Plaintiff's grievances were denied.

129.   Plaintiff wrote many requests to defendants Brown and Snyder, specifically requesting a more meaningful review of his placement in solitary confinement.

130.   Plaintiff received responses from defendants Brown, Gilmore, and Snyder.

131.   The defendants responded claiming that; (a) the SHU is not solitary confinement and (b) that plaintiff was Disciplinary Restricted Status, and, therefore, not entitled to a meaningful review.

132.   Plaintiff has retained all of his exchanges with the defendants, original documents with the defendants' responses and signatures.

133.   Plaintiff has also retained copies of his grievances and all of his original 30-day review sheets.

134.   Plaintiff has also obtained, as supporting evidence, several 30-day review sheets from several other prisoners, housed in SHU along-side plaintiff, to show that, not only were each of plaintiff's review sheets identical each month, but that they were also identical to every other inmate housed on that unit, at that time.

135.   Plaintiff made the defendants aware of his need for a meaningful review.

136   The defendants not only denied plaintiff his right to due process, but went so far as to create a

25.

paper-trail of sham reviews to give the appearance that more due process was being provided.

## ✱ NOTES TO THE COURT

137.   1. Plaintiff is a former prisoner and is not bound by the restrictions of the P.L.R.A. § 1997 (e). Therefore, the defendants need not waste the Court's time and resources filing any Motions for Partial Summary Judgment for failure to exhaust administrative remedies.

138.   2. Plaintiff humbly requests that the Court not only consider the two-years plaintiff spent in solitary confinement, but also the additional year that plaintiff would have remained in the SHU, had he not been released from IDOC custody.  Hanrahan v. Doling; 331 F. 3d 93. Magistrate Judge reasoned that, the defendants fully expected the prisoner to serve a 120 month SHU sentence, not the 335 days actually served before his appeal was granted."Therefore, the 120 month SHU sentence... is the appropriate durational focus."

Documentary evidence will show that Mr. Kuhn had disciplinary segregation time extending 1-year beyond his IDOC release date, and that the defendants had no intention of releasing plaintiff from the SHU prior to that date.

The offender OIS reflected an EPRD of May 4, 2020, however, the defendants continued to provide plaintiff with 30 day review sheets showing a Segregation Release Date of March 8, 2021. Therefore, plaintiff requests that the durational focus be closer to 3-years, rather than 2-years.

139.    3.  The defendants, as prison officials, knew or should have known that disciplinary segregation inmates housed in SHU are required to receive more due process in the form of meaningful reviews. While there is no brightline rule as to duration, the 2nd Circuit Court of Appeals has decided that a SHU sentence of 101-305 days is atypical, sparking a liberty interest.

Plaintiff requested due process in the form of a meaningful review. The defendants falsely informed plaintiff that he was not required to receive meaningful reviews. That is clearly fraudulent concealment.

140.   4.  After hearing about Isby v. Brown and Isby v. Wynn, 2018, plaintiff attempted to obtain more information about those cases and plaintiff's own due process rights.

The defendants, namely Jerry Snyder, falsely informed plaintiff that those cases did not exist, and that he had no due process rights due to his disciplinary status. That also clearly amounts to fraudulent concealment

141.   5. Defendants knowingly and intentionally placed Covid-19 positive inmates in SHU. in extremely close proximity to plaintiff, putting him in very high risk of contracting the virus, endangering plaintiff's health and life.


## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

142.   Plaintiff has timely exhausted all available administrative remedies prior to filing this complaint.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter an order:

143.   Issuing declaratory relief, declaring that the acts and omissions of the defendants have violated plaintiff's rights, and stating the defendants' duties with respect to those rights.

144.   Awarding plaintiff punitive and compensatory damages for the unnecessary deterioration of his physical and mental well-being, diminished quality of life, and consequential pain and emotional suffering, in an amount as yet to be deduced from the evidence, but in no event in an amount less than $350,000.00; and

145.   Any other relief that this Court may deem just and proper.

146.   A jury trial is hereby demanded on all claims alleged herein, and the parties are hereby given notice pursuant to Fed. R. Civ. P. 38 (a)-(c).

Respectfully submitted this 27th day of April, 2022.

Cody Kuhn

Plaintiff.

28.

## VIII  VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Cody Kuhn, declare and verify, under penalty of perjury under the laws of the United States of America, that I have read the foregoing and that it is true and correct to the best of my belief and Knowledge.

Dated this 27th day of April, 2022

Cody Kuhn

29.

## CERTIFICATE OF SERVICE

I hereby certify that on April 27th, 2022, the foregoing was submitted to the Clerk of the Court for filing, by mail, United States Postal Service, postage prepaid.

Cody Kuhn,
Plaintiff.

Address: 739 1st Street
Shelbyville, IN.
46176

Phone: (463) 218-2244

email: CFASS94@Gmail.com